American Home Assurance Company v. Superior Well Services Good morning, your honors. May it please the court. Reeves Anderson for American Home Assurance Company. I'd like to reserve three minutes for rebuttal if I could. All right. This court's decisions in Sapa, Specialty Services, and CPB International interpreted identical insurance policy language to hold that there was no general liability accident coverage for faulty workmanship claims because there was no occurrence. The decision below cannot be squared with those precedents. As in those cases, Superior's choices in fracking U.S. Energy's wells were no accident, and American Home has no duty to indemnify under the policy here. To understand why, I think it's helpful to frame the discussion today around two core points. First, we know from the Pennsylvania Supreme Court's decision in Kaverna that faulty workmanship can never to constitute an accident. Can you just take on the assertions being made by Superior Well and U.S. Energy that there was, I take them to be saying, there was sufficient fortuity here because there was no, they didn't intend any of this bad stuff to happen. There was no desire to do some harm. It was necessarily unintended. It was necessarily, because of that, rightly viewed as accidental since it wasn't intended and so should fit within the language which I take them to be disputing too. Your Honor, this court rejected that exact distinction in Sapa. In fact, it called it irrelevant, as did the Pennsylvania Supreme Court in Kaverna because the Pennsylvania Supreme Court in Kaverna recognized that faulty workmanship claims, it is always foreseeable that damage could occur because of the work product or the project upon which you're working. In fact, the Kaverna court said to incorporate an intent, did I intend to do the damage, would erase the word accident. Now, there are policies that incorporate the concept of intent into an occurrence and this court in Sapa was faced with a number of different insurance policies and it divided them into three categories. The first is what it called the accident definition of occurrence and said intent is irrelevant. There were two other versions of the definition of occurrence that used the word intent and it remanded those policies to determine if intent was relevant. But Kaverna announced a bright line rule and specifically said the intent to do harm. In fact, it is the rare, it's almost impossible to imagine that a contractor intends to damage the property upon which they're working. So are you saying that this could only be good coverage against a tort? Because I guess I'm struggling a little bit here because your argument seems to be they didn't, sure they didn't intend to do it, but it would have to be really shoddy workmanship, really terrible workmanship, would have to be negligent workmanship for them to take themselves outside the coverage? Yes, and this is exactly what the Pennsylvania Supreme Court was wrestling with in Kaverna and that this court applied in Sapa and specialty services. It recognized that when the claim is that there were professional choices made about the services, the services that were being provided, that it is always foreseeable when those professional choices were made in what we call poor workmanship or shoddy workmanship, failure to meet applicable industry standards, failure to perform quality control. It is always foreseeable that those will lead to damage. Those are not sufficiently fortuitous to constitute an accident. And that's the bright line rule announced by the Pennsylvania Supreme Court. That's precisely what this court applied in Sapa, specialty services, CPB, R.M. Shoemaker, which your honor was on that panel, recognized that when the underlying claim is for faulty workmanship, it is never going to constitute an accident under the language of this policy. And the second fact here that I think drives this point home is that the underlying verdict in the underlying case found that U.S. Energy's contracts were damaged because Superior failed to perform its contract in a workmanlike manner. That makes this case easier than Sapa and specialty services where there was a duty to defend, which takes a liberal construction of the allegations and says there's a duty to defend that there's even potential coverage. Here we have an actual. And they and they they did defend. Can you can you talk about the district court's ruling that the other side takes some pushback on this a little bit. But your your position is that the district court said the occurrence language is overridden by the endorsement. So let's assume you're correct about that. What can an endorsement never mean? By definition, endorsement varies the language of the underlying instrument, right? So what's what was wrong with the district court saying they went out of their way under these circumstances to try to protect against problems in the wells and they bought and paid for over a period of years for this coverage to protect them against that. And that that overrides this more narrow definition of occurrence that the insurance company is trying to get away with here. Like take that on if you would. Well, that distinction only makes a difference if the endorsement eliminates the occurrence requirement from the policy altogether. And that's the fact be done impliedly here. We need not even could it be done impliedly? Yes, I suppose it could if there were an irreconcilable conflict between terms of the policy. But here not only do we have no conflict, they've identified no textual conflict between the endorsement and the body of the policy. But we specifically have explicit textual incorporation of the occurrence requirement into the endorsement itself. So it's helpful to actually put our hands around the endorsement. It's at page 374 of the appendix. And it says that it adds five discrete provisions to the body of the policy. What we call provisions A, B, C, D and E. Provision A sets a new aggregate limit for any property damage that arises under that endorsement. And it says that it is the most we will pay under coverage A. Coverage A is what has the occurrence requirement. And it says anything we pay here is subject to paragraph 5. So if we follow back to paragraph 5 in section 3 of the policy, paragraph 5 is in each occurrence limit. It says this is the most we will pay for any property damage arising out of an occurrence. In other words, any payment that flows from the UREC endorsement is subject to a per occurrence limit. So far from conflicting, it actually incorporates the occurrence limit directly into the endorsement. Therefore, we're right back into SAPA. We're right back in the specialty services. We're right back into CPB International. Is the court, I'm going to quote you something from the district court. This is on page 19 of the slip of opinion, A23 in the appendix. The clear intent of the parties to the insurance agreement and superiors reasonable expectation was that any property damage described in sections 2A, B, and C of the endorsement, the one we're talking about, must be covered if such damage arose out of superiors operations as clearly defined in the endorsement. There's a statement there that reading the documents, the court understood the intent of the parties was to have the endorsement provide exactly the coverage you're saying they don't have. Obviously, you're saying that's wrong. Can you explain to us where you think that the district court went off the rails? How could an experienced judge look at these documents and say, well, that's the intent of the party if you're saying it's absolutely not the intent of the party? Your Honor, I think there are three questions baked in. I'll take them each in turn. So the first is the way to determine the intent of the parties is to look at the unambiguous text. And so that's what we have done. And the district court's opinion does not wrestle with any of the points that I just made. In fact, the appellee's briefing doesn't even address the subject of paragraph five or coverage A that's incorporated into the EURIC endorsement. Second, the reasonable expectations of the insured cannot overcome the unambiguous text. The reasonable expectations exception to the unambiguous text rule first only applies to non-commercial insureds, but it also can apply to non-commercial insureds when there is a unilateral change made by the insurance company that has not happened here or that they deceived the insured about what the policy meant. There's no allegation of that here. So to get to your third point about operations. So the court relied myopically on this term operations to fundamentally change the character of this policy into a guarantee of all of superiors work akin to a performance bond or professional liability. The word operations here serves a limiting purpose. What the policy text shows is that they were not expanding the scope of property damage for any activity arising out of any accident. They said we'll expand the underground resources hazard for accidents that arise out of your operations. So we need to read all the policy language harmoniously. There is no conflict between that provision and the occurrence provision in the underlying policy. That would be one interpretation of that language, but why isn't it also a reasonable interpretation to think of the reference to operations as expanding that coverage, at least for the limited circumstance where it's damaged to that property underground. And if we are in the world of ambiguity, we've got some cannons of construction that work against you. So respectfully, your honor, I think that's not a reasonable interpretation of the text precisely because the occurrence requirement is expressly incorporated into the endorsement itself. So it can't be read as reading out the occurrence requirement altogether. Every court to interpret UREC endorsements has adopted the interpretation that I'm advocating for today. They've said that it serves a very particular purpose. Provision B of the UREC endorsement adds an exception to an exclusion in the underlying policy. There is an exclusion, a complete exclusion, for property damage to all personal property in the care, custody, and control of the insured. The UREC endorsement says we're going to add a carve out to that. And if there is property damage in the care, custody, and control of the insured that arises, that includes the hazards identified, so oil, gas, wells, and machinery, we will allow that to come back into coverage. But it doesn't transform the policy into one insuring all of their operations. We know how to do that because if you look at the appendix page 393, we have a separate endorsement. It's called the employee benefits liability insurance. That is a new form of insurance. It's an insuring agreement. It says we will pay for claims that arise out of wrongful acts. It says that here are the exceptions. It's a standalone endorsement that operates as an insuring agreement. So I see I'm out of time. Reserve the rest for rebuttal. Yes, we'll have you back on rebuttal. Thank you, Your Honor. Thank you, Your Honor. Misha Tsaitlin for Superior Well. I will take 10 minutes and my colleague from U.S. Energy will take five minutes. The district court rejected all of the arguments that my friend raised here based upon the UREC endorsement and the facts that were found by the New York jury. However, I think there is a predicate question that needs to be addressed first, under which all of the arguments that you've heard from my friend are entirely estopped under binding Pennsylvania law. Under Pennsylvania law, and in particular the selective way insurance case, in order for an insurer to preserve arguments against providing coverage, the insurer has to provide timely and sufficient notice to a reservation of rights letter. Here, there was never that timely and sufficient notice with regard to any of the arguments that you heard here today provided. So you're suggesting that none of these things were litigated below? We fully raised the estoppel argument. It was fully briefed and we briefed it here. The district court didn't address estoppel at all and made a correct analysis of UREC endorsement and rejected their arguments. But we think that estoppel is a prior question and this court should reject all those arguments on estoppel. Well, let's just assume for the sake of argument that we weren't inclined to do that and let's get into the issues. Okay, your honor. I would appreciate a couple of minutes at the end to talk about estoppel if I could. Yeah, maybe we'll have that. Maybe we won't. If you've addressed it in your papers. Did you address it in your papers? Yes, but there was confusion I created in the reply brief that I wanted a chance to address. Okay. Why don't you, why don't you please first tell us whether you agree or disagree with the argument from American Home that the district court effectively threw out or completely eliminated the occurrence language because of the endorsement. The language that the district court used, and this is on appendix 22, is that the UREC endorsement expands or supersedes the occurrence requirement. I would say it in a different way. I would say that the endorsement needs to be read in peri materia with the occurrence requirement. Well, how do we, how do we get, first tell us what language could you rely on within the document itself that would tell you that it either expanded or eliminated it? Well, so I would not have used the phrase expand or eliminate. I would use it in peri materia. That's the language that the court used. So you got to, you might have written it differently, but we're reviewing what the district court did and said it did. Are you then acknowledging that there is no language in the document that can be read as expanding on or eliminating the occurrence? Certainly not in peri materia, but I will take expanding if it's necessary. Although we think we win under just the straight occurrence, but particularly in peri materia with UREC, you can say expanding. Now UREC modifies and adds to the general contractual liability policy to provide coverage on a per well basis to damage to certain underground resources. Yeah, we've read it. Trust me, we've read it. So they press hard on the assertion that, and I don't think they disagree that you got to read these things in peri materia. What they are saying is that you folks have pointed to nothing, nothing at all in the documents that could be read as expanding on the notion of occurrence. That occurrence is just what Kaverner says it is, just what Sapa says it is, just what specialty surfaces and CPB, all those cases say it is, that is something that's accidental. Can you tell us the language you're relying on that reading these things in peri materia would lead us to say, no, it's something other than that. So we read accidental occurrence in the same way that the Pennsylvania Supreme Court in the most recent case in the 2020 case out of Moore read it, which is unexpected or undesirable. That's the Pennsylvania Supreme Court's latest articulation of that. And we think that if you read the UREC endorsement in peri materia with occurrence, you get the same meaning, which is that if there is damage to underground resources from the operations of these fracking operations, that is undesirable and unexpected. So wait, so then, then, then you really are arguing that this is a performance bond. You're saying any, any bad thing that happened, unless you knew it was going to happen, is covered by this. It's not a performance bond. If we didn't show up and frack the wells, we couldn't, we wouldn't get coverage for that. We frack the wells. We put the chemicals in, we put the breakers in. What happened, unfortunately, is for some, not all the wells, there wasn't the proper mixture. And so there was less natural gas extracted than otherwise would have been. On this, the UREC endorsement, you know, you're leaning on this prefatory sentence, but the prefatory sentence says the following provisions are added and it fits into the broader category of property damage. And, you know, it's limited to operations described in this endorsement and to the hazard on the first page. So all of this ties into property damage, which is, we go back to, it's only covered if it results from an occurrence. There's nothing that gets rid of the occurrence requirement. Your Honor, we're not arguing for getting rid of the occurrence requirement. In fact, we've argued that there are, that there were 53 different occurrences. What we're arguing is that if you read it in the extremely narrow way that they're urging, the UREC endorsement becomes illusory. Of course, any time we're going to be fracking a well, there's going to be a contract. If something goes wrong and we're held liable for that, that's going to be held or argued to be a faulty workmanship. So what they would do is they would render the entire operations aspect of the UREC endorsement an effective nullity, which is why I say- How so? How so? I don't understand that. I understand their argument to be, no, if there were an actual accident, if there were an actual occurrence that was not traceable to shoddy workmanship, shoddy delivery of services, then that would be covered. If there were, through nobody's fault, negligence, or problem, there were, you know, a spark went down there, blew the well up, something like that, you'd be covered. At least I take that to be their argument. I'm sure Mr. Anderson will correct me if I've got that wrong, but that's what I understood from the documents in his presentation. How is that rendering it a nullity? I mean, it's an effective nullity because in the real world, the kinds of problems that occur in underground fracking, they're from operations. They're the kind of problems here. It would make no sense to pay real value for this kind of endorsement that deals with operations, where the only thing you could get recovery for would be, act of God, a lightning bolt goes into the well. Exactly the kind of, and this is why the district judge said what he said on appendix 23, exactly the kind of risks that are involved in underground fracking are the ones that materialized here. Now, if I may, your honor, I would really like to talk about estoppel because it didn't... Well, let me start you with this. I found the reply brief at 23 to 27 devastating for your argument because in Pennsylvania, the doctrine of waiver of estoppel cannot create coverage when nonexistent. Pennsylvania Superior Court has said it multiple times. We said it last fall in Stevonna Towing. You are basically trying to create coverage based on estoppel. That's sitting aside the boatload of places in the record that they identify having preserved this. Let's just deal with this. How can you create coverage with estoppel? Absolutely, your honor. Under the Selective Way Insurance case, that case is very clear that they have to raise any objection to coverage in the ROR. There is no distinction between arguments like the occurrence argument and exclusions. We know that even more so from the Millet case, which is the Pennsylvania Supreme Court case from 1929, which was the primary case that Selective Way Insurance analyzed. In that case, the insurance company didn't raise the fact that the guy didn't own the car, that he was just a lessee. The Pennsylvania Supreme Court said, that's still estoppel. In fact, this very issue, as far as I could tell... I got to slow you down. I know you're trying to... But I'm not hearing, maybe I'm just not hearing. There's an insurance case that they are quoting in their reply brief that says, in Pennsylvania, the doctrine of waiver or estoppel cannot create coverage where none existed. Can you speak to that? That seems to be saying, clearly, as a matter of Pennsylvania law, you cannot... If there was no coverage to start with, you can't create coverage by saying, hey, they didn't do certain preliminary things. All that means is there's no insurance contract at all. Here, there's obviously insurance contract, there's obviously the URAC endorsement. After seeing the reply brief, they didn't actually cite any cases that draw this exclusion versus coverage distinction. They tried a lot, and we did some research. The only case I found analyzing this very issue, after reading the reply brief, was an Eastern District of Pennsylvania case, 493 FSUP. Right, it doesn't bind us. Why should it persuade us? Just because I have a limited amount of time here, the Eastern District does go through the Malay case, Selective Way Insurance case, and it explains why that distinction makes no difference. The point of Selective Way Insurance is that for the insured, needs to receive sufficient warning that there might be some basis on which the claim is denied. The insurance company can't sandbag, and what the Eastern District explained there, analyzing the 1929 case from the Pennsylvania Supreme Court in Malay, is that there is no distinction between an exclusion, which was the issue in Selective Way Insurance, or any other basis on denial of coverage. If you take a look at the two cases they cite in their reply brief, they don't support that distinction in any way, shape, or form. All right. Well, we're going to hear from your colleague, who's got, I think, five minutes, right? Thank you very much, Mr. Tadhorn. Good morning, Your Honors, and may it please the Court, I'm Will Sazewski from Hodgson-Russ for... How do you say your last name again, sir? Sazewski, Judge. Thank you. Represent Appelli Intervenor U.S. Energy here. In the limited time I have, I would like to address the accidental occurrence aspect of this case, and explain why, in our view, the damage to U.S. Energy's wells was caused by accidental occurrences, even putting aside the UREC endorsement and those issues, and why, under Pennsylvania and Third Circuit precedent, these damages were not caused by faulty workmanship. So, my colleague, Misha Saitlin, did mention a recent case from the Pennsylvania Supreme Court, ERIE Insurance Exchange v. Moore, which, in 2020, seized on the unexpected or undesirable nature of an event to kind of cabin what is an occurrence, what is an accident. Here, in terms of what happened to U.S. Energy's wells, U.S. Energy hired Superior to hydrofrack its gas to escape and be processed. Their services had the exact opposite effect. They destroyed the geology of the wells irreparably. They trapped the gas inside. In our view... Will that... Yeah. They agree with all of that. Yes. And they say that's exactly why it's not an occurrence, within the meaning of the... understood meaning of that word in insurance law under Pennsylvania law. Understood, Your Honor. And so, under those faulty workmanship cases, Kverner, CPP, the Condroiton case, or specialty services, yes, the court does, you know, explain, you know, improper delivery of a product over the composition of which or the structure of which you had control that is deficient. That's not an occurrence. That's not standards in a contract. That was in your control. That's not fortuitous. But I do want to raise an issue that came up in the Condroiton case, CBP, and in specialty services, where the insurance made an argument that, okay, perhaps our work was not... our screwed up work, for lack of a better term, was not accidental. But it caused damage to other property. That's the occurrence here. And this circuit, in both of those cases, said, well, no. In the Condroiton case, look, it was foreseeable that that Condroiton would be incorporated into those tablets. You knew that. Those damages to those tablets, that flowed naturally from your screwed up work. In specialty services, it was the same thing. They failed to install a correct drainage system. It was natural that the field would flood and cause that damage. Here, it's a little bit different. They performed these fracking services, obviously improperly. Obviously, it went wrong. But the way that it damaged these wells, this was just totally... it cannot be said to have been a natural outcome of just doing the fracking wrong. Why not? Just because the chemistry is more challenging than a drainage system's mechanical issues are challenging, perhaps. Why is that a distinction with a legal difference and not just the sort of thing where you'd say, yeah, no, a doctor can hurt you in more complicated ways than a mugger can. But a doctor hurting you is still hurting you. And it's not, quote, an accident. I understood, Your Honor. There's a couple of pieces of record evidence that kind of go to this point. The president of US Energy, when he testified at trial in his long career, stated that he had been involved with fracking over 2,500 natural gas wells. He had never seen something like this happen before. He had never seen an unbroken frack substance come back to the surface. US Energy originally had a claim for consequential damages in this case. At the close of evidence at the trial, the judge dismissed it. You know, one of the elements of that claim is the damages had to be foreseeable at the time of contracting. Superior could not fulfill their burden. I'm sorry, US Energy could not fulfill its burden on that claim. That actually ties into a couple of these Third Circuit cases. In the Condroiton case, the court made the specific observation that, well, the damage to these tablets, you can't say it's unforeseeable. You have a claim for consequential damages. One of the elements is that those damages were foreseeable. I think that that aspect of it, the couple of pieces that I've just mentioned, that takes it out of that realm. This was truly an accidental series of occurrences. That seems to have this sort of perverse consequence that if you manage to mess up on a scale no one's ever seen before, you're so horrifically bad that in 25 years of working with people, I've never seen anybody foul it up this badly. That means, okay, good, now I got coverage. Because I wasn't just shoddy and bad, I was epically shoddy and bad. How could that be? Well, I take your point, Your Honor, and I take the hypothetical. I think what happened here, though, is that when you look at the facts, Superior Fract 97 of U.S. Energy's wells, what they were doing didn't always screw up the well. So the jury did not find that in 44 cases. 53 times it did, right? Yes, Your Honor. But in varied ways, in different geologies, which this ties into the number of occurrences argument. I know I'm out of this. It makes for strange bedfellows that you and Superior are here together and from the briefing, it's apparent that your arguments, you're not distancing yourself from the argument Superior has made here. You're adding your own, right? Yes, Your Honor. Okay. Well, then we've got it. We've got the argument. Thank you very much. Your Honor, I'd like to respond to four points. Why don't you start right off with the estoppel? Every single reservation of rights letter made the exact same arguments I've made today, the same arguments we've made in the district court briefing. You'll see all of that in the reply brief where we lay out where those reservation rights letters, what they say. We began from the premise that there was no occurrence. Therefore, there is no coverage. There were a number of other arguments, including contractual liability. So, we reserved our rights. We identified the bases. We made all these arguments below. There's no ground for the estoppel argument. So, to the point about whether the URIC endorsement expands or supersedes the definition of occurrence, that's what the district court held. Occurrence is a defined term. When you want to see what it looks like to expand or supersede the definition of a defined term, you should look to this court's decision from 1981 in St. Paul Fire, where the body of the policy defined the word damage and endorsement defined it differently and more expansively. That's how you override the definition. Why don't you please respond? And I apologize if I get that. It's Setlin, right? Thank you. Mr. Setlin's argument that we should be paying attention to the latest pronouncement from the district court, it frames the use of occurrence in a way that actually does capture your behavior here. And it captures it in the way that Mr. Suzuki is also pointing out, which is that this was something unexpected. Certainly, nobody intended it. But beyond that, nobody anticipated that this could happen. And in that respect, it's got to be seen as an occurrence. What's your response? So I think he's relying on Erie versus Boer, Your Honor. That case found that in, first of all, it's a duty to defend case, and it was bound by the allegations in the complaint, liberally construed. And it found that in a fight, a gun accidentally went off. That was the allegation. Now, when the gun was intentionally fired, when it wasn't an accident by any stretch of the imagination, there was no coverage. It did not revisit the decisions in Kverner, had nothing to do with faulty workmanship whatsoever. The key point here is that the Pennsylvania Supreme Court already wrestled with the very question we're presented with today, that claims for faulty workmanship constitute accidents. And categorically, they do not. And I understand that my opposing counsel wants to revisit some of the facts, but we have a jury verdict here. The finding of liability was failure to perform in a workmanlike manner. This court in specialty surfaces said those two terms are correct. This court has reiterated that in six other occasions, you'll see that on footnote three from our brief. And I want to also make the point that, you know, you don't have to have a 100% fail rate in order for something to constitute faulty workmanship. In SAPA, some of the aluminum extrusions failed. Some did not. That did not make it not faulty workmanship. Finally, the contractual liability exclusion independently excludes coverage here. That was this court's holding in CPB International. Congress famously does not hide elephants in mouth holes. Neither do insurance contracts. We're not. That's that's your like triple fallback argument, right? Oh, I'm just saying in terms of the going back to the UREC endorsement, the idea that simply alluding to an operation in a prefatory clause does not transform that endorsement into a professional liability policy. In Kverner, I think it's important to look at footnote 11. Kverner had three insurance policies in that case. Two of them provided coverage. We got you. We got you. Thank you, Your Honor. We respectfully ask the court reverse and enter judgment in favor of American Home. All right. Thank you. Appreciate the argument from all counsel here today. We've got the matter under advisement. We'll call the next case.